First case on the docket this morning is 22-40570, United States v. Garcia. Mr. Lake. Thank you, Your Honor, and may it please the Court. I represent Liang Yu. This Court and the Supreme Court hold jury verdicts in high esteem, but both courts also hold the government to its high burden of proving every element of every crime beyond a reasonable doubt. And for that reason, neither court has hesitated to vacate money-laundering convictions when the government fails to prove the mens rea element, which this Court describes as the gravamen of a money-laundering violation. Today I plan to focus my very limited time on our sufficiency argument regarding the intent element of Mr. Yu's two money-laundering convictions. At trial, the government failed to prove that Mr. Yu had the specific intent to promote drug trafficking. To the contrary, nearly all of its witnesses explained that in this particular drug organization, operations are bifurcated. There's a drug group and a money group, and they're kept in the dark from one another. And so in this case, not a single witness said that Mr. Yu knew drugs were involved in any way. No one said that he knew this was drug money. He had no reason to know, much less intend to promote drug trafficking. And so here what we have is evidence that Mr. Yu probably did not know the exact opposite of what the government would have needed to prove, which is that he intended to promote drug trafficking with his actions. So in closing argument, the government told the jury that in the Villa Lobos drug trafficking organization, the operations, the information is highly compartmentalized. That's the way the government described it. And it said that because its lead case agent had said the same. Agent Rosado testified that every drug organization is different, but this particular drug organization split itself so that it had a drug cell and a money cell. The government also called Juan Villa Lobos, who was a co-leader of this Villa Lobos drug trafficking organization. And he explained the same, that they had a drug crew and a money crew. And he said there was a policy that the less the money crew knows, the better. Or we could look at Tomas Villa Real, another government witness who was described as the banker, because he handled the group's money. He moved about $9 million every month, was the testimony. What he said is that his boss in the drug organization didn't trust the money couriers, to the point that that's why Tomas was told to vacuum seal the money, to wrap it so tight with tape, because they didn't even trust that they wouldn't pull bills out of the money. There was no level of trust with the money crew. And so we can look at Ruby Guzman, who is the woman, the government's witness. She's the woman that delivered the money to the Hilton Hotel for the events in Count 13. She testified that at one point she had started asking questions. She asked, why are the amounts so large? What are we doing? Where's this money coming from? And one of the drug boss's response was to threaten her, to intimidate her, to demand to see her driver's license, presumably to get her home address. And so she said she learned to stop asking questions she didn't need to know. So under cross-examination, she was asked, did she know where this money was going, the money that ultimately was in the suitcase that my client, Mr. Yu, was pulling? And she said no, she had no idea where it was going or what it was for. She specifically said it might have been for a legitimate purpose. She simply didn't know. And that's a woman that was living in and running the money stash house for this organization. Someone with far more involvement than Mr. Yu. And so that uncontested government evidence about how this particular organization operates, combined with well-established precedent, establishes that the government simply didn't prove an essential element here. And so I would start with the Supreme Court's decision in Cuellar. It was a unanimous court where Justice Thomas explained that how one transports money is distinct from why they transport the money. And the quote from that opinion is, evidence of the former standing alone is not sufficient to prove the latter. So here, yes, there is money in suitcases being handed off in a parking lot, but that simply doesn't speak to why Mr. Yu would have been involved. It doesn't show what he thought was going on or what his intent was. And so there's an absence, contrary to, so in Cuellar it's a unanimous court, but Justice Alito wrote a concurring opinion to explain how the government could prove this in future cases. And he said the way they could do it is to put on testimony, perhaps from an agent, that either in this organization or this geographical area, it's commonly known how this operation works, such that a person would have to know, this is the way it operates. If I move the money, I'm supporting the drug organization. That's nearly 180 degrees from what they did in this case, which was to say there was no common knowledge, because by design, the money people were kept in the dark. They didn't know what was going on. They didn't know why the money was being moved. So then I moved to this court's decision in Trejo from 2010, where the court explained that it's not enough for the government to leave the fact finder to speculate how the defendant could have intended to promote drug trafficking activity when he knew nothing about it at all. And that's the scenario here. It would be pure speculation to say why Mr. Yu was moving the money. The record is silent entirely. In addition, the court in Trejo pointed to other cases where this court has affirmed money laundering convictions, and it described that usually there's some additional evidence. There has to be something more than just the transportation. And so if you look at footnote eight of that opinion, it lists six cases where there was enough evidence. All six of those, the defendant had knowledge of the drug activity. Sometimes they were physically packaging it. Sometimes they were physically moving it. Sometimes it was a conversation about drugs. But in all six, they knew this was a drug activity, even if they were moving money. That didn't happen here. I also would point to the Seventh Circuit's Adams opinion, where a woman was buying money orders multiple times, five, six times. And on prior occasions, she had transported drugs, even physically strapped to her body sometimes. And that wasn't enough because when it came to purchasing money orders, she wasn't told why. She didn't know the purpose of those money orders. And so the court said it was insufficient to leave the jury guessing why she would have bought the money orders. What did she think they were for, which is very similar to our situation. And finally, this court's decision in SESA, I think, is important because there you have repetitive behavior, which the government certainly alleged, as far as my client goes, in this case. In SESA, the defendant, this court, found that the evidence was insufficient to convict the defendant, even though he received over half a million dollars in cash over a period of 22 months, and he personally traveled to Mexico to meet in person with a drug leader. All of that was insufficient because the court said as a matter of law, it's insufficient simply to show that a person provided services to a known drug dealer. That's not sufficient as a matter of law. At best, that's what the government showed here. But they even went further than that, putting on affirmative evidence that the money people wouldn't know this was a drug operation. They wouldn't know any of those details. And so my time is closing, but I just wanted to quickly point to the government identifies three areas where it says it presented sufficient evidence. It agrees it's not direct evidence. At best, it claims it's indirect circumstantial evidence. But those three factors would fail if applied to this court's SESA opinion. That defendant received money from multiple drug organization members, which he then structured before he deposited it in his own accounts. That defendant personally traveled and met with a drug boss and was known by the drug organization to be helping it wash its money. All that was insufficient because he didn't know that's what he was doing. He was not privy to the fact that this was promoting a drug trafficking organization, which is the same as with Mr. Yu. I see my time is up, so I've reserved two minutes. Thank you. Rolando Garza for Maria Garcia. She was a co-defendant in this case. She has basically the same arguments as co-defendant Yu or alleged co-defendant Yu. But she's got an added thing going on here, is that it does not appear that she's part of the alleged indicted conspiracy. Basically what's happened is that there was a raid on this O'Malley residence. After that, we find out that there's people there, a lot of money, a lot of stuff going on there. They talked to a Ruby. Ruby gives some information that she's transporting money for different organizations. There's ledgers. There's stuff like that that is found. Later on, the agents followed a person by the name of Christian Benavides. That's where I've really been struggling. How is this Christian Benavides connected to this O'Malley residence? Where is it? I've looked for it. Anything in the ledgers? No. Anything in the digital evidence? Couldn't find any. Maria Garcia, she consented to a search of her cell phone. I didn't see anything about her cell phone with any of these people in the O'Malley residence or any of that. I looked at the government's brief. They cite two pages in the record. I go back to those two pages. There's two pages noted, at least under my appellate cause number, 608 and 1003. I go back to those page numbers. The questioning goes along the lines of this. This is asked of Agent Persuade. It says, on July 11, 2016, we were conducting surveillance. That's an answer to, so what were you doing on July 11, 2016? The agent says, we received information that an individual by the name of Chris was headed into Houston and we were provided the vehicle information. All right. It doesn't say where this information came from. Where did it come from? Who provided it? What organization is he part of? It doesn't add anything. Then, on the other page, 1003, it's similar. The government asks, now turning our attention to July 11, 2016, what happened on that particular date? Well, on that particular date, we identified Christian Benavides leaving from McAllen, Texas to Houston to pick up some money in a white Range Rover. Again, it doesn't say who's the source of information, where it came from, some subsidiary, who provided it, what organization is he part of. Throughout the record, what is seen is about 90%, at least, is dedicated to this O'Malley residence and the occupants and the people from Mexico. There's all these names and a lot of particulars, and nobody names as Christian Benavides. In fact, when Christian Benavides gets pulled over with the money, it turns into this black hole. Christian Benavides, where are you going? What are you doing? Who are you working for? There's nothing, zero. And so, what ends up happening during the course of trial is there's all these questions about you, Xie, everyone else, and nobody talks about Maria. Nobody does. It's only an agent at the very end, after talking to Christian, goes back to this house in Tongkawa, I believe it's called, goes back there, and then there's some conflicting stories in the course of trial. Maria testified, pretty much contradicting what the agent said, but the agent says they show up and that Maria's there and that somebody had dropped off some money earlier, somebody else picked it up, she allegedly got a call from somebody in Mexico. Again, none of these people are ever listed, named in any fashion to the O'Malley residence. So Maria has this extra thing in that the indicted charge, she was never, conspiracy, she was never connected to that, nor the people that, I guess, are named with her. And then, aside from that, she's got the other arguments, you know, nobody told her it was drug money. She didn't know about the inner particulars of any kind of drug trafficking organization. She didn't know any of that. There was no evidence of anything like that, nothing that the money was going to be going to Mexico, there was nothing like that. There is some, I guess, hints where you have agents testifying, well, you know, this is common practice of drug traffickers and things of that nature, but I think in Trejo, which I cited in my brief, there is some notation there that such, you know, generalizations should not be used to support convictions when you have just an agent saying, well, this is how things are typically done, this is what they do, that that's really not sufficient to be upholding convictions on any kind of case. And so Maria has those two arguments, basically, that she's not part of the indicted conspiracy. She didn't know about any kind of drug trafficking convictions, and also it wasn't her end goal, which ultimately is, I guess, the final test in all of this, that she wanted to further this drug trafficking conspiracy by moving these funds into Mexico, that that's what she meant to do. It's really, I think, the statute, which is really a higher crime than just regular money laundering, kind of separate and distinct, that she's kind of at the low end. Maybe there's something here, maybe another statute that could have been enforced or something, but not this. This has elements way beyond what Maria was doing. It's way beyond that. Basically, this is, that kind of statute, the promotional money laundering statute, I believe, is really targeted more to the more hands-on higher-ups who are saying, okay, you know, we're going to bring this money, okay, we're going to get it to Mexico, and then we're going to buy drugs with it, and you talk to that person about the drugs, yes, we can get a better price, this is only how much money is coming in, this is how much we can launder, and how are we going to do that, and what are we going to do? How are we going to further our venture in this drug trafficking conspiracy? And everyone else that are like underlings, and as Council Lake described, everyone was given very limited information further down the line to where, yeah, people at the very end were told, okay, we'll go to a residence and open the door for somebody, somebody's going to show up, okay, and we'll give you a couple of bucks for that, all right. And so they get involved in that fashion, but again, as Council Lake described, they're not in the inner workings, they're not moving drugs, they're not in the know, they're very limited in what they know and what they're doing, and that's basically what has occurred in this case. So just again, I think I share the same arguments as Council Lake, but I would just add the it was not shown that she was part of this indicted conspiracy. Questions? No? I'll give some time back. Thank you. May it please the Court, Anna Kaleri on behalf of the United States. A few points. The first is that, yes, this DTO was bifurcated in terms of there was a group of people who were in charge of the money part and a group of people who were in charge of the drug part, but it doesn't mean that there was no information that crossed between. Two examples of this are Michael Tovar, he sold cocaine and he transported money. Mr. Benavidez, his car was searched and it had cocaine and cash in it. As the higher up you go, the more people knew about what was going on. While it's true, they might not know the specific details about the manner, timing of how drugs were brought up from Mexico or how exactly the money was packaged and which cars and who took it all the way back to Mexico. It was not a complete isolation of information for everyone. Now moving to Mr. Yu's sufficiency claims. I think what's important here is to go through Trejo, Cessa, and Adams first and show kind of what the facts were and how they differ from what we have here. In Trejo, Trejo had one run of money hidden in his car and he went to the border. Here we have a lot more than that. In Cessa, and I'll get to that in a moment, in Cessa, one of the issues was that the money that was being paid was to a gentleman who was arguably a very well regarded horse trainer. And so the money, the drug money, went to him to actually train the horses. So there was actually a separate reason and purpose for the money that went to him. It wasn't just to money launder. And then we have Adams. And Adams, she did transport marijuana between states for the other defendant there. And then as part of that, she was paid for it. She also got money orders for it. But what the court had issue with was the money orders were used for various purposes. In one instance, it was to buy a car. In another, it was to reimburse her for gas because she wasn't paid for it. Sometimes it was just her fee. So there was nothing that she knew, or was told, or that the government could prove, that it was actually in furtherance of the drug conspiracy. In contrast, here, you had knowledge of the scheme and its participant. He knew he was transporting cash. When they saw him in the lobby, he said, these are my deposits. He transported cash multiple times. Juan Villalobos testified that he met with Z and U two to three times. And then he gave them $1 million the first time. Villarreal also testified that he delivered money to you and she three times, $2 million twice, and $1.8 million the second time. He also testified that you picked up money on his own once, and she helped him twice. So while they typically work together, they weren't always together. Moreover, there was contact with the DTO in Mexico. And we know this because of the use of the serial numbers on the bills. To confirm identity, you and she had to show the DTO courier a bill that matched the serial number the courier had been given from either their immediate supervisor in the United States, and the information came from the bosses in Mexico. Both Juan and Villarreal testified that the images of those serial numbers came from Mexico. In addition, Santiago would tell Juan how to package the money. And the packaging of the money was based on information from she and you. Moreover, we have intercepted text messages from the bosses in Mexico. So the title threes were on the people in Mexico, Santiago and another man known as the accountant there, and that's how we have this information. So around May 19th, during that seizure, that's where there was a number of intercepted text messages referencing that you and she were going to be, or that she knows were going to be picking up the money, and that this is who they typically used for this money. So based on all of these facts, I think we have much more than we have in Trejo, Sessa, and Adams. In terms of, there was no legitimate purpose for all this money. It happened numerous times. They were intimately aware of the process by picking up large amounts of cash and trying and putting it in the packaging and how they were communicating with the bosses in Mexico. Regarding Garcia, Garcia was recruited by Benavides in Mexico. So there is a connection there. And Benavides was later discovered with both cocaine and money in his car when they searched the Land Rover. We know that she, for the conspiracy, there was a concerted action with Benavides, who was her recruiter. She received information from her boss in Mexico, El Viejo, and Reyes Acuna, who was her cousin and a courier. She knew, based on the association with her conspiracers, she repeated trips to the Stats House. She went there two times a month from Louisiana. She would drive there. She would oversee them. She knew that the cash came in. Presumably, she saw the packaging. And as we know from a lot of the testimony, the packaging was specific to be hidden in cars to be able to be transported back down to Mexico. She agreed to accept payment in housing for overseeing the transfer. In addition, it was a significant amount of money. We know that she did this two to three times a month, and we know that Benavides was stopped with about $200,000 in his cash. All of that together, her knowledge, her association, the length of it, all of that supports her convictions here. Unless there are any questions on suppression or the motion for new trial, I'll rest on my brief. Thank you. If your owners have any questions, I'm certainly happy to answer those. Otherwise, I'll leave you with, I think, two thoughts. One is in Trejo that the government just referenced. That defendant had far more knowledge than Mr. Yu. When caught, he confessed that there was money concealed in a hidden compartment in his car. He knew it was drug money. He knew it was coming from a drug dealer. He knew it was going to a drug dealer. That defendant knew far more than Mr. Yu did, and it was not sufficient. And in Trejo, again, this court held that it was not enough to leave the fact finder to speculate how the defendant was intending to promote drug trafficking when he didn't know anything about it. That's our facts. And then I also would point to the government's final words in closing argument. It's page 1131 of the record, where it says that in the Villalobos Drug Trafficking Organization, information is highly compartmentalized. You are told what you need to know, and you don't ask beyond what you need to know. Throughout trial, the government's argument was no one knew what everyone was doing. They didn't know the details. No one at trial said there was communication between my client and any drug boss. The government now says the opposite, but at trial, it said there's no communication. We're all segregated out. We're separate and compartmentalized. The record doesn't support knowledge, much less specific intent. And so to sum up, I would say Mr. Yu didn't know there was drugs involved. He certainly didn't intend to promote drug trafficking. Remind me if there was instruction to the jury on intentionally not wanting to know, essentially, blinding yourself to the facts. I apologize. I don't remember whether the jury was instructed. I would say it wouldn't be sufficient here. Deliberate ignorance can satisfy a knowledge requirement, but not specific intent. In short, you can blind yourself to things you should know or otherwise would know. You can't blind yourself to your own intent inwardly formed. So deliberate ignorance wouldn't have satisfied the element here. But I apologize. I don't recall if it was an instruction that was given. Thank you. Just to leave off with where Counsel Lake left off. I don't recall such instruction given to the jury about deliberate blindness. I would like to address something the government said during an argument. When Mr. Benavides was pulled over, he had money, and he did have cocaine, but it wasn't like bricks of cocaine. It wasn't like kilos. It was like a usable amount of cocaine. So maybe he was a drug user maybe, but it wasn't like kilos and kilos. It was a usable amount of cocaine. And again, on page 16, I did note out on my brief about how we have these agents testifying just in generalities about how, well, this is how drug dealers do this, and so they all kind of know, they should know, they know. Similar issue came up in Trejo, where they had an IRS agent talk about, okay, well, this is how they do this, this is how they launder funds. And in Trejo, it's noted that they say that they could not credit the IRS agent's affidavit describing Trejo's conduct as typical of an experienced drug trafficker, money launderer. We have cautions against relying upon such drug profiling testimony to prove a defendant's mental state. And that's in the brief. And so I rely on that. And this is actually even a little more stringent here under Trejo. It's really a stringent standard, is that even when you're conspiring or aiding and abetting, you have to share that same intent of promotion as the principal. You can't just kind of like pawn it off. You really have to be in lockstep with this whole promotional activity. And so that's all I have. Thank you, Counselor. Thank you.